Q. This appeal raises three important questions. The first is whether a patent claim can be found ineligible under Section 101 as directed to an abstract idea without identifying the specific abstract idea. Second, can claims be found invalid under Section 101 if the claims are limited to combinations of specific components that comprise a special purpose computer? And third, can claims be found ineligible under Section 101 if the claims don't preempt any abstract idea? We respectfully submit that the District Court erred in analyzing all three of these questions. The District Court failed to identify a specific abstract idea, failed to consider the limitations as an ordered combination as directed by the Supreme Court, and erred in its analysis of the preemption argument. Can I just ask, the notion of an abstract idea, as you know, is not the most precise notion in the world, in any walk of life, but including in 101. So one can formulate an abstract idea as what a claim is directed to at many different levels of generality. Given that, why isn't it unreasonable, why is it not unreasonable to demand a particular formulation when it is clear that, for example here, we have something like a series of contractual decision-making of an extremely familiar sort in the familiar world of banking, and then add ordinary computer facilities, but that gets to the second half. But at the first level, one could use many different words to get at the same basic idea, and the fact that you can use many different words, why should that be a problem? Respectfully, I don't agree that that can be done. I think that there needs to be a precise articulation. Frankly, there are very few protections that are offered to patent owners today within the realm of 101, but one of them certainly must be that there are two steps to the Alice Mayo analysis. And the first is that there be a clearly articulated abstract idea, because everything else flows from that. And it's also a gatekeeper question, which is that we understand from Supreme Court authority that long predates this case, that abstract ideas are not simply ideas. The question isn't whether you can reduce the claim so much that you can come to an idea that the claim is directed to. That isn't an abstract idea. That's running the risk of undercutting the entirety of patent law. An abstract idea must be something else. If you take the word abstract out of idea, I think what it's directed to is an idea. An abstract idea is a fundamental principle. It's a longstanding economic practice. We've seen them in a number of ways, and if you take this protection away from patent owners, you're basically inviting the invalidation of all patents, because all patents can be reduced to an idea. That's where they came from. They're intellectual property. So I don't agree that it is a step that can be taken in removing that protection from patent owners. Allowing everybody to move straight to the second step is basically truncating the 103 analysis. It's looking at what the invented concept was. Truncating the 101 analysis, but moving to a 103 analysis, changing it into an analysis of inventiveness. And that's not what it is. First, before you get there, I'm mindful of the fact that 101 is very broad. It's read to include things like combinations or improvements of machines. And the Supreme Court has warned time and again, and this court has as well, that because of the breadth of 101, the exclusions have to be read narrowly. Diamond versus Deere had a wonderful quote that said that you really need to be, at page 182, they said, in dealing with the patent laws, we have more than once cautioned that courts should not read into the patent laws limitations and conditions which the legislature has not expressed. We have a very broad statute. We have very narrow exclusions. The suggestion that you could jump to ineligibility by jumping over the abstract idea exception, in broadening It seems like a pretty abstract argument itself. That sounds like a pretty abstract argument itself. I mean, so what was done here, the record seems to suggest, was well known before and broad in scope. And why doesn't that satisfy the first step? The first step needs to be a clearly articulated abstract idea or else the first step means You mean it's not possible to articulate a clear first step here that's abstract? It's not possible to articulate an abstract idea here as the first step? I mean, you seem to be complaining that there's inconsistency in this case in articulating the first step, but who cares? If we can articulate an abstract idea as the first step, that's all that's required. We're on summary judgment here. Your Honor, in this case, the abstract idea was not expressed by either of you. Can't you just read the claims and see? These are claims involving processing financial transactions and allowing users to determine parameters for which transactions should be allowed or not, and doing it on computers. These are exactly the same kind of claims that the Supreme Court has rejected and that we've rejected repeatedly since Alice. I don't understand what your argument is on this first point other than saying the district court has to write a better opinion. But we can look at these claims and see that they're exactly the type of claims we've rejected in the past year or so since Alice on numerous occasions. Well, respectfully, Your Honor, the only time that this court has acted to find patent claims ineligible is when there hasn't been a clearly articulated abstract idea. The only time that I can think of in the past year where there's been difficulty identifying abstract ideas is... Okay, so can we put this clearly identifying thing aside? How are these claims any different than the ones we've rejected in BiSafe, in Ultramercial, in all those cases? Thank you, Your Honor. That is the key point and the key differentiator here. It's not just the ministerial error with respect to the abstract idea. It was fundamentally not looking at the elements of these claims as an order of combination. As an order of combination, the invention in this case is the central transaction processing computer. Are you trying to argue that a program computer is patentable under 101? Your Honor, what I'm arguing is... Isn't that long gone after Alice? Your Honor, what I'm arguing in this case is that this invention is a special purpose computer, which is, as we understand it, a computer that is arranged and programmed in a way that is non-conventional or non-traditional in the specific industry. In this case, this computer didn't exist. It didn't exist whether you analyzed this as a computer that was perhaps in your home or whether it was a computer in the banking world. It didn't exist. So the computer in BiSafe that was programmed to do these third-party guarantees instantaneously and online, that didn't exist either, but we rejected it because it was doing an abstract idea programmed on a computer. How do you distinguish that? It's not just the programming here that we have. It's not just how the system works. It's how it's arranged together. And this is very distinct. But you're not arguing that this is a special new invented computer. It's a newly programmed computer. No, it's a new... Well, where in the claims does it say anything about a new type of computer? It talks about a memory device and a processing device. Those sound like the most basic generic computer components imaginable. The arrangement of these computers, it has never been true that we need to have invented each component. The arrangement is what is key here. This arrangement was never done before. The arrangement was, back in 1996, was allowing somebody to access and reach behind the firewall of a bank and act as their own private banker by affecting the memory of a bank. And then separate and apart from that interaction, being notified of that transaction through a different band, we call it out-of-band communication, so that that would be understood to be a safe transaction. This was so important that the federal government actually mandated this in 2011 and noticed it as an issue in 2005, some 10 years after we invented it. So this special purpose computer is a combination... If you look at the claims, particularly Claim 317, for example, what you have is an exploded view of this central processing computer which was defined by the U.S. EPA. And this is a very special computer that never existed before, not in any form. And what you see is the interaction of the ability to interact through this special computer, this specially programmed and assembled computer, in a way that was not previously possible. Because remember what was happening in 1996, and that was one of the things that is extremely important in this case, is that the expert testimony is very clear. These are non-conventional, not only non-conventional, but unconventional computers. In fact, they were computers that were made against industry advice. People were concerned at that time about the use of the Internet. This is 20 years later, but at the time, this was something that was solving a problem that arose from the Internet. We know that at the time, banking was done from modem to modem on your personal computer with downloaded software, where you had control of that computer. That was your security. But if you wanted to go somewhere else and use an Internet-driven environment, you couldn't. And the industry was saying you can't do that. We showed them how it was possible by creating this new machine, the Central Processing Computer. So this is very different. This is the sort of invented concept. You invented the CPU? The CPU is not the invention. The CPC, Your Honor, is the Central Processing Computer, or the Central Transaction Processing Computer. Yes, we know that the processor, for example, within that has been defined as being not just the CPU. We know that that computer is a very robust and very unique piece of equipment that did not exist before. And it enabled communications that had not occurred before. And it enabled the relationship of the customer to the bank that did not exist before. So we think we satisfy, I mean, the one-on-one analysis obviously derives first and foremost from the identification of the incorrect idea. You look at these issues about whether they're tied to a specific computer as being an indicator of their being an invented concept. You also look at the concept of preemption. This, too, is where the district court... You're into your rebuttal time. Do you want to save it? I will save it. Thank you, Your Honor. Okay. Thank you. Mr. Jones? Thank you, Your Honor. As this court has observed on a number of occasions over the last several years, courts have used the Supreme Court and this court in Section 101 to deal with cases just exactly like this. It was really a case where we could have one or two cases that would fit into the little small box that says these are cases that survive a one-on-one challenge. And then we have a very large box over here with cases like dealer tracking and ultramercial and buy safe and the others. And we think it's very clear that because two courts, two district courts, have now held that this case does not, this claim in 103 does not survive a one-on-one. And because it is nothing more than claiming a generic computer doing things that other people have been doing for many, many years, it fits very clearly into this box with buy safe and ultramercial and dealer track and intellectual ventures versus Cap One and the other cases. It is not true that Judge Robinson did not determine that there was an abstract idea. At most, there seems to be a complaint that she didn't name it. But she did, in fact, discuss exactly the abstract idea that we put forth in our brief. She reproduced the table for one of the claims that shows what that basic business practice was, the interaction between the bank customer and the bank teller or the banker. And she clearly found that that was, in fact, the conventional business practice that was at issue here. I don't think we need to spend a lot of time talking about that. Can I just ask you this question, which may not be all that well formulated, but DDR got at an important topic that there is, in fact, a massive world of networking and computers and improvements in that world, including how results are displayed are within 101. Why is this not like that as Mr. Richardson, I think, just tried to convey that there were previously computerized systems for banking. They had some problems. This patent claims certain kinds of improvements in that computerized system for banking that now enable something that wasn't done before. That's not what this patent claims are on. Tell me why not. If you look at columns two and three in the patent, actually column one beginning line 38 and running really through column two at the bottom of column two and over into the middle of column three. It describes there what the problem is that's being addressed. And the problem there is, very simply put, people have checking accounts and credit cards and that is an easy way to do business. The problem is that there is fraud. And you don't find out about the fraud sometimes until you receive your monthly statement. And so the invention that's described in this patent and the related patents is very simply, we're going to hook things up in a way that allows somebody to find out more quickly what has been happening on their account. There's nothing in the specification, nothing in the claims that describes problems in the existing world of internet banking or computerized banking. The problem described is not the kind of problem that was described in DDR. In DDR the problem was something that only existed in and because of the way internet web pages were put together and how navigation occurred. That was the problem, the court said, that survives 101 because we have a problem that only exists in the world of computers and internet and you have a solution here that solves that particular problem of clicking and going away from the web page and coming back to the same one. That is a very different thing. Here the problem is firmly rooted in the pre-computer world, the pre-internet world. There's nothing in the specification or in the claims that says we're trying to solve a problem about internet banking. It's just not there. Let me talk, let me go a little bit to the issue of what exactly is in here. It really does, as the court has observed, describe nothing more than generic, a general purpose computer described as general purpose generic parts. A memory device that does nothing more than store information. A processing device that processes information. And Mr. Richardson makes a statement about the central transaction processing computer as being a special purpose computer. That term was construed by the district court and was described, construed simply as a computer through which banking transactions were processed. That's at page 110 of the appendix. So there's nothing special about a central transaction processing computer. It's just a computer that's programmed to handle banking transactions. We have a transmitter that transmits, we have a receiver that receives, we have a communication device that can be almost anything, and then we have this general computer. We also know that the general computer, there's nothing special about how the computer was programmed three different times in the specification. Column 17, line 25, column 25, line 17, and column 32, line 16. The inventor says that the processing device can use any of the widely known processing and software routines which are known to those skilled in the art in order to process transactional requests through authorizations involving any of these things. So what do we have? We have a general purpose computer claimed as general purpose generic computer parts using prior part software to process banking transactions. And the only thing one can say about it is that it does it faster than these transactions were accomplished before. And as this court has observed in Bancorp and a number of other cases, doing something on a computer, doing something using the internet, doing something faster than it was happening before when human beings thought it up and could do it with a pen and paper, that does not provide the inventive concept that is necessary to survive on the second step of the Alice case. Let me jump to the preemption argument very quickly. There are three problems with the argument that this is patentable because it doesn't preempt every single embodiment of the abstract idea. The first is that we know from this court's intellectual ventures case and from Alice and Gilsky that an abstract idea does not become non-abstract by limiting it to a particular field of use or technological environment, including the internet. We also know that, and this is in a relatively new case, the OIP Technologies case versus Amazon, claims that do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make limiting less abstract. And finally, this court, in the very recent opinion, Arioso Diagnostics versus Sequinon, really put the nail in this coffin on preemption. It very clearly said, and I won't go through the lengthy quote, but it says that where a patent's claims are deemed only to disclose patent-ineligible subject matter under the Mayo framework, preemption concerns are fully addressed and made known. In other words, you don't have to get into an esoteric discussion about preemption. You do the two Alice-Mayo steps. If you fall under both of those Alice-Mayo steps, preemption concerns are moved. The case is over. Unless the court has questions, Your Honor, I would stay silent. Okay. Thank you, Mr. Jackson. Thank you, Your Honor. Your Honor, just a few points I'd like to raise. The machine or transformation test, which is one of the tests that was enunciated in the lower court's order, was not carried out properly in our opinion. In that case, the court pointed to the CERF case pointing to the inclusion of a GPS receiver as being tied to a specific machine. In this case, we have more than this. We have internet receivers known as network interface cards. They're not called out specifically, but these are receivers and transmitters that work on the internet. Similar to the CERF case, these are tied to specific machines. I'm aware the machine or transformation test is not the exclusive test to determine patent-ineligibility, but it is still a useful clue. We also look at the issue of preemption. My concerns with preemption is the Supreme Court itself was concerned with preemption as being the focal point of this analysis, and I don't agree with my colleague that it can be simply discarded. I have two concerns in this case. One is that when the court below articulated her conclusion that the claims preempted an abstract idea, she used a construction of the abstract idea that had never been posited by the defendant. We were confronted with seven potential abstract ideas, and then in fact on an eighth when it came to the question of whether preemption was there. The conclusion on preemption also happens to be wrong, because it doesn't take into account the fact there were numerous other ways in 1996, certainly, to have accomplished this, both through the use of different types of networks and structuring different types of transactions between the customer and the bank. So the preemption analysis was flawed. The machine or transformation test was flawed. The first step of the Mayo Alice analysis was flawed. The second step didn't take into account the ordered combination of these components. When you put these together, this is a very narrow system, a series of very narrow systems that include things in some of the later claims, like network computers, calling out specific non-typical, non-conventional devices, including things like email and the necessary email servers, which at the time in 1996 were not typical. The use of the internet, the My colleague said, well, there's no reference to internet banking. Well, there's a reason. Internet banking didn't exist in 1996. Okay, Mr. Richardson, I think we're out of time. Thank you very much. Thank you both counsel. The case is submitted, and that concludes our session for this morning. All rise.